UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ESTATE OF JOHN BUONOCORE III,** *et al.*,

    **Plaintiffs,**

        v.                                               Civil Action No. 06-727 (JMF)

**GREAT SOCIALIST PEOPLE'S LIBYAN
ARAB JAMAHIRIYA,** *et al.*,

    **Defendants.**

**VICTOR SIMPSON,** *et al.*,

    **Plaintiffs,**

        v.                                               Civil Action No. 08-529 (JMF)

**GREAT SOCIALIST PEOPLE'S LIBYAN
ARAB JAMAHIRIYA,** *et al.*,

    **Defendants.**

**SECOND FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]
AND ORDER**

This opinion addresses, but does not fully resolve, the claims brought by the following plaintiffs:  1) Bruno Pepenella, 2) Armando Pepenella (estate of), 3) Salvatore Ferrigno, and 4) Francesco Zerelli.

---

[1] The opinion incorporates by reference the first <u>Findings of Fact and Conclusions of Law</u>, issued in both cases on January 29, 2013.

**FINDINGS OF FACT**

**I.      The Tommarello/Pepenella Family**

    **A.      Elena Tommarello[2]**

1.      Elena Tommarello ("Elena") was born in Italy on January 18, 1918, and became a naturalized U.S. citizen on November 10, 1972. (Ex. 89; B. Pepenella, T-24-122)

2.      From the time of her naturalization until the date of her death, Elena did not renounce her U.S. citizenship, and she remained a U.S. citizen. (B. Pepenella, T-24-137)

3.      At the time of her death, Elena had two sons: 1) Bruno Pepenella ("Bruno"); and 2) Armando Pepenella ("Armando"). (A. Pepenella, T-24-139)

    **B.      Bruno Pepenella**

4.      Bruno is a U.S. permanent resident. (Ex. 68)  He lives in Pennsylvania. Buonocore, Civil Action No. 06-727, Second Amended Complaint for Compensatory and Punitive Damages [#82] ¶ 29.[3]

    **C.      Armando Pepenella**

5.      Armando, who was a U.S. permanent resident (Ex. 69 at 7), died on August 13, 2011. Buonocore, Civil Action No. 06-727, Plaintiffs' Motion for Substitution of Party [#100] at 1.  He lived in Florida. [#82] ¶ 28.

6.      On June 8, 2012, Bennett L. Wetzell was appointed the personal representative of Armando's estate. Buonocore, Civil Action No. 06-727, Plaintiffs' Motion for Substitution of Party [#100] at 1.

---

[2] Although Elena Tommarello's claims are not being considered in this opinion, facts pertaining to her legal status and death are relevant to the analysis of her sons' claims.

[3] Both Bruno and Armando are identified as U.S. citizens in the Second Amended Complaint. [#82] ¶¶ 28-29, but the trial testimony only indicated that they were permanent residents.

### C. The Attack and its Aftermath

7. On the morning of December 27, 1985, Elena was at the Rome Fiumicino airport preparing to travel back to the U.S. to spend the New Year's holiday with her children and grandchildren. (B. Pepenella, T-24-130)

8. After the attack, Elena was transported to the hospital, where she died in the early hours of December 28, 1985. (Ex. 91; B. Pepenella, T-24-132-33)

9. Armando testified about what the doctor told him about his mother's condition: "The doctor told me that her body was shattered from the waste [sic] down – her midriff and legs – by bullets fired by an automatic weapon. The doctor told me that she was conscious in the hospital and aware of what was happening but that her condition was very grave . . . She lived for many hours, and was conscious for part of them, with these horrific wounds." (Ex. 69 – A. Pepenella, Affidavit ¶¶ 14-15)

10. Bruno testified that prior to his marriage, his mother lived with him, and that even after he was married, his relationship with his mother remained very close. (B. Pepenella, T-24-128)

11. Bruno testified that after he was married, he saw his mother once or twice every week. (B. Pepenella, T-24-128)

12. Bruno testified that every time his mother would travel, Bruno would have her stay at his house the night before, and cook dinner for her. (B. Pepenella, T-24-129-30)

13. Bruno testified about how he felt after his mother died: "For two years, you know, I couldn't get out of my mind after that happened. I had a pain in my stomach, and I don't know where it was, whatever it is called, in other words, the anxiety. And they said it was the tension from my mother that I was so tied up that's why it was hurt. There was nothing hurt as

3

sickness, in other words.  It was from the muscles pain that I had, and my muscles tied up, and that's what caused me the pain.  And for two years, I tell you, it was pain because you remember the things.  Every time I go to wash my face in the mirror, my mother appears there.  It was very, very stressful for the first two years.  It still comes up every once in awhile [sic]; but, you know, things get away, especially when you don't mention.  When you start talking about it, it brings back bad memories . . . The worst part is, you know, she died, and I couldn't say good-bye, I couldn't say how much I love her." (B. Pepenella, T-24-135-36)

    14.    Armando testified about how he felt when he found out his mother had been shot: "I was shocked and in panic.  All I wanted to do was get to her to be with her.  I began to realize that I would probably not be able to make it to Italy before she died.  I felt totally helpless . . . My mother died the next day, December 28, 1985, in the early morning hours . . . I was devastated and in disbelief.  She lived for many hours and was conscious for part of them with these horrific wounds . . . One of the hardest things to live with has always been that I was not able to see my mother one last time to say good-bye to her . . . There are no words that can adequately describe the pain or express the loss.  Preparing this document has brought back many painful emotions." (A. Pepenella, T-24-139-40)

## II. **Salvatore Ferrigno**

### A. **Salvatore Ferrigno**

    15.    Salvatore Ferrigno ("Salvatore") was born in Italy on February 28, 1960. (Ex. 22; S. Ferrigno, T-22B-52)

    16.    On September 27, 1985, Salvatore was granted lawful U.S. permanent resident status. (Ex. 88)

17. At the time of the December 27, 1985 Rome Airport attack, Salvatore intended to become a U.S. citizen. (S. Ferrigno, T-22B-54-56)

18. Salvatore became eligible to apply for U.S. citizenship in 1990, five years after becoming a permanent resident. (S. Ferrigno, T-22B-59)

19. Salvatore was unable to apply for U.S. citizenship at that point because he was unable to work, due to the injuries he suffered during the attack, and therefore he was unable to show any record of paying income taxes in the U.S. (S. Ferrigno, T-22B-60)

20. Salvatore became a U.S. citizen on September 22, 1993, and has remained a U.S. citizen from the date of his naturalization through the present. (Ex. 21; S. Ferrigno, T-22B-56-58, 60)

### B. The Attack and its Aftermath

21. On December 27, 1985, Salvatore was at the Rome Fiumicino Airport on his way from Palermo, Italy, to his home near Trenton, New Jersey. (S. Ferrigno, T-22B-62-63)

22. Salvatore had to change planes in Rome because there were no non-stop flights between Palermo and New York. (S. Ferrigno, T-22B-62)

23. Salvatore suffered gunshot and shrapnel wounds to his chest and finger. (Ex. 23A; S. Ferrigno, T-22B-65)

24. Salvatore testified that when he was taken to a hospital after being shot, he heard a doctor say that he was not going to make it and would probably die within the next fifteen minutes. (S. Ferrigno, T-22B-70)

25. Salvatore testified that he was in a coma for a week after being shot and was in the hospital for a total of twenty days. (S. Ferrigno, T-22B-71, 75)

26. Salvatore testified what it felt like not being able to play guitar after being shot and losing a piece of his finger: "Because I was a young kid, I was playing guitar, I was not able to do what I was doing. And that's—really, emotionally, it destroy [sic] you physically. I mean, even mentally, you're not able to do the simple things in life you were doing before." (S. Ferrigno, T-22B-73-74)

27. Salvatore testified about his life after the shooting: "Like I say, I was not able to work. I was anxious to work, but I was not able because, you know, it devastated me physically, economically . . . Physical pain and sometimes—it is also kind of emotional things. Every time I pass through an airport, I never walk in the middle of the room; I always try to walk on the side. And every time I hear some firecrackers, and it happened to me once, more than once, automatically—I don't know what happened in my mind—I have to suddenly lie down on the floor." (S. Ferrigno, T-22B-77, 83)

**III.   Francesco Zerelli**

    **A.   Francesco Zerilli**

28. Francesco Zerilli ("Francesco") was born in Italy on March 30, 1961. (Ex. 71; F. Zerilli, T-24-41)

29. Francesco met and fell in love with Angie (Palazzo) Zerilli ("Angie") in 1984, while she was vacationing in Italy. (F. Zerilli, T-24-42)

30. Angie returned to the U.S. after the summer of 1984 but returned to Italy in 1985 (F. Zerilli, T-24-42)

31. Francesco and Angie lived together from April of 1985 to October of 1985. (F. Zerilli, T-24-43)

32.     Angie returned to the U.S. in October of 1985 to plan their wedding. (F. Zerilli, T-24-44)

33.     Francesco moved to the U.S. in February of 1986. (F. Zerilli, T-24-44)

34.     Francesco became a U.S. citizen on August 28, 2006, and has remained a U.S. citizen from the date of his naturalization through the present. (Ex. 70; F. Zerilli, T-24-47)

     B.     **The Attack and its Aftermath**

35.     On December 27, 1985, Francesco was at the Rome Fiumicino Airport on his way to the U.S. in order to join Angie so that they could marry and he could permanently immigrate to the U.S. (F. Zerilli, T-24-48)

36.     Francesco suffered gunshot and shrapnel wounds to his right hand. (Ex. 72A; F. Zerilli, T-24-50)

37.     Francesco testified that when the shooting began at the Rome Airport, he threw himself down to the floor and a woman who had been shot fell on top of him and died "almost instantly." (F. Zerilli, T-24-49)

38.     Francesco testified that shortly after he was shot in the hand, he became scared because he felt as though he was "losing consciousness." (F. Zerilli, T-24-54)

39.     Francesco testified that after the attack, he lost a lot of mobility in the hand that was injured and, as a result, transitioned from being a fashion photographer to doing table top work such as photographing jewelry and watches. (F. Zerilli, T-24-59, 61-62)

40.     Angie testified about the effect of the attack on her and her husband: "Well, I mean, it was a really, really dark time, obviously, for everyone. Very painful. There are things that he still suffers today that he's limited to. We had plans. He had his whole life planned out for him, what he wanted to do and what we were going to do together, moving to New York.

And for such a long time he—he became real reclusive, afraid to be in a large crowd, let alone a city, couldn't travel. He—I mean he really suffered on a mental level; he really, really suffered. And it was a hard time. It was a hard time for him. It was a hard time for me. We were supposed to start our life together. It was supposed to be a happy time. He was miserable. It was tough, very tough." (A. Zerilli, T-24-66)

41.     Angie testified that after her husband came to the U.S., she stopped working as a piano teacher and began assisting him with his work. (A. Zerilli, T-24-70)

## CONCLUSIONS OF LAW

I.   <u>Subject Matter Jurisdiction</u>

Under the Foreign Sovereign Immunities Act ("FSIA"), this court has subject matter jurisdiction over cases where either "the claimant or the victim was, at the time of the [terrorist] act . . . (I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the Unites States . . ." 28 U.S.C. § 1605A(a)(2)(A)(ii). Since none of the above-named plaintiffs were U.S. citizens at the time of the attack, the first issue that must be resolved is the meaning of the term U.S. national.

Under the U.S. Code, "[t]he term 'national of the United States' means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22). In <u>Lin v. United States</u>, 561 F.3d 502 (D.C. Cir. 2009), the court of appeals addressed the issue created by the words "owes permanent allegiance to the United States" and came to the following conclusion:

> We join the majority of our colleagues and conclude manifestations of "permanent allegiance" do not, by themselves, render a person a U.S. national. *See MarquezAlmanzar v. INS*, 418 F.3d 210, 218-19 (2d Cir. 2005) (holding "one cannot qualify as a U.S. national under 8 U.S.C. § 1101(a)(22)(B) by a manifestation

>of 'permanent allegiance' to the United States. . . . [T]he road to U.S. nationality runs through provisions detailed elsewhere in the Code, see 8 U.S.C. §§ 1401-58, and those provisions indicate that the only 'non-citizen nationals' currently recognized by our law are persons deemed to be so under 8 U.S.C. § 1408."); see also *AbouHaidar v. Gonzales*, 437 F.3d 206, 207 (1st Cir. 2006) ("The overwhelming majority of circuit courts to consider the question have concluded that one can become a 'national' of the United States only by birth or by naturalization under the process set by Congress."); *Sebastian-Soler v. U.S. Att'y Gen.*, 409 F.3d 1280, 1285-87 (11th Cir. 2005); *Salim v. Ashcroft*, 350 F.3d 307, 309-10 (3d Cir. 2003); *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 972 (9th Cir. 2003).[4]

Id. at 508.

### A.   The Pepenella Brothers

With respect to the Pepenella brothers, although they were not U.S. nationals at the time of the attack, their mother, Elena Tomarello, was a naturalized U.S. citizen at the time of the incident. Therefore, because the FSIA grants this court subject matter jurisdiction over cases where either "the claimant *or the victim* was, at the time of the [terrorist] act" (emphasis added), a U.S. national and because Elana Tomarello was a U.S. national by virtue of being a naturalized U.S. citizen, this court has subject matter jurisdiction over the Pepenella brothers' claims.

### B.   Salavatore Ferrigno

Salvatore Ferrigno was not a U.S. national at the time of the attack. Furthermore, he is not seeking redress for injuries caused to someone else, but for his own injuries. Therefore,

---

[4] Accord: Andujar v. Att't Gen., 435 Fed. Appx. 140, 143 (3d Cir. 2011) (alien who made oath of allegiance to United States is not a national; filing application for naturalization is not enough); Fernandez v. Keisler, 502 F.3d 337, 349 (4th Cir. 2007) (alien who begins but does not complete naturalization process is not a national of the United States even though he was a lawful permanent resident); Daly v. Gonzales, 129 Fed. Appx. 837 (honorably discharged United States Marine not a national even though he applied for naturalization, took an oath of allegiance to United States when he enlisted, and resided in the United States for many years).

since neither the claimant (Salvatore Ferrigno) nor the victim (himself) was a U.S. national at the time of the incident, this court lacks subject matter jurisdiction over his claims.

### C.   Francesco Zerelli

Francesco Zerelli was not a U.S. national at the time of the attack.  Furthermore, he is not seeking redress for injuries caused to someone else, but for his own injuries.  Therefore, since neither the claimant (Francesco Zerelli) nor the victim (himself) was a U.S. national at the time of the incident, this court lacks subject matter jurisdiction over his claims.

## II.   Cause of Action

Since this Court can only assert subject matter jurisdiction over the Pepenella brothers' claims, the next issue is whether they have articulated a viable cause of action.

### A.   Private Federal Right of Action

In 2008, Congress amended the FSIA to create a federal private right of action.  In pertinent part, the statute states the following: "A foreign state that is or was a state sponsor of terrorism . . . shall be liable to . . . (1) a national of the United States, (2) a member of the armed forces, (3) an employee of the Government of the United States . . . or (4) the legal representative of a person described in paragraph (1), (2), or (3)." 28 U.S.C. § 1605A(c).  Unlike the statute's broad grant of subject matter jurisdiction over claims brought by both U.S. nationals and non-U.S. nationals (in cases where the victim was a U.S. national), Congress limited the scope of the private cause of action to only those claims brought by the four categories of individuals stated above.  Therefore, because the Pepenella brothers do not fit into any of those categories, they cannot avail themselves of the FSIA's private right of action.  That does not mean, however, that they lack any cause of action.

### B.   "Pass Through" Claims

10

In <u>Leibovitch v. Islamic Republic of Iran</u>, 697 F.3d 561 (7th Cir. 2012), the seventh circuit considered whether foreign national family members of a U.S. citizen who was killed in a terrorist attack in Israel had a cause of action under FSIA. <u>Id.</u> at 562. The court concluded, citing Judge Bates' decision in <u>Estate of Doe v. Islamic Republic of Iran</u>, 808 F. Supp. 1 (D.D.C. 2011), that, although they could not pursue a claim for personal injuries under § 1605(A)(c), they could nevertheless pursue "pass through" claims under applicable state or foreign law, based on the waiver of sovereign immunity granted in § 1605A(a)(2)(A)(ii). <u>Leibovitch</u>, 697 F.3d at 572 n.6.

**ORDER**

In the <u>Second Amended Complaint for Compensatory and Punitive Damages</u> [#82], filed in the <u>Buonocore</u> case, Civil Action No. 06-727, the Pepenalla brothers assert the following alternative common law and statutory claims:

| PLAINTIFFS | COUNT | CLAIM<br>CL = State Common Law<br>SL = State Statutory Law |
|---|---|---|
| Bruno Pepenella<br>&<br>Armando Pepenella<br>(estate of) | IV | Intentional Infliction of Emotional Distress, Including Solatium – CL |
|  | VII | Civil Conspiracy - CL |
|  | VIII | Aiding and Abetting – CL and SL |
|  | IX | Punitive Damages - CL |

However, despite the fact that Armando Pepenella lived in Florida and Bruno Pepenella lives in Pennsylvania, plaintiffs have not provided any analysis of the laws of those states, nor have they discussed choice of law issues. Therefore, I will therefore not proceed with their claims until they file a memorandum of law supporting their claims and addressing the above two issues. The memorandum of law is due within 21 days of the date of this order.

**SO ORDERED.**

                                                                                                       _____
JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE