UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


**ESTATE OF JOHN BUONOCORE III,** *et al.***,**

    **Plaintiffs,**

        **v.**                            **Civil Action No. 06-727 (JMF)**

**GREAT SOCIALIST PEOPLE'S LIBYAN**
**ARAB JAMAHIRIYA,** *et al.***,**

    **Defendants.**


**VICTOR SIMPSON,** *et al.***,**

    **Plaintiffs,**

        **v.**                            **Civil Action No. 08-529 (JMF)**

**GREAT SOCIALIST PEOPLE'S LIBYAN**
**ARAB JAMAHIRIYA,** *et al.***,**

    **Defendants.**


**FOURTH FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

On April 17, 2013, the Court concluded that Italian law applied to the claims of the two remaining plaintiffs in this case,[2] the Pepenella brothers. [#117] at 3-6.  To that end, the Court ordered plaintiffs to file "a supplemental brief explaining how, as a matter of Italian civil law, the Pepenella brothers are entitled to damages for intentional infliction of emotional distress and civil conspiracy, the two counts they now assert." Id. at 6.  Plaintiffs have now done so and the

---

[1] The opinion incorporates by reference the first Findings of Fact and Conclusions of Law [#109], the Second Findings of Fact and Conclusions of Law [#110], and the Third Findings of Fact and Conclusions of Law and Order [#117].  The document numbers given in this opinion refer to those assigned in the earlier civil action, 06-727.
[2] These findings of fact and conclusions of law resolve two pending cases.

issue is ready for resolution.  See Plaintiffs' Supplemental Memorandum in Support of Claims of Pepenella Brothers Under Italian Law [#120].

## FINDINGS OF FACT[3]

1.  Elena Tommarello ("Elena") was born in Italy on January 18, 1918, and became a naturalized United States citizen on November 10, 1972. (Ex. 89; B. Pepenella, T-24-122)

2.  From the time of her naturalization until the date of her death, Elena did not renounce her United States citizenship and she remained a U.S. citizen. (B. Pepenella, T-24-137)

3.  At the time of her death, Elena had two sons:  1) Bruno Pepenella ("Bruno"); and 2) Armando Pepenella ("Armando"). (A. Pepenella, T-24-139)

4.  Bruno became a United States permanent resident (Ex. 68) but was not at the time of his mother's death. [#120] at 5.  He lives in Pennsylvania. Second Amended Complaint for Compensatory and Punitive Damages [#82] ¶ 29.

5.  Armando became a United States permanent resident (Ex. 69 at pg. 7), but was not at the time of his mother's death. [#120] at 5.  He died on August 13, 2011. Plaintiffs' Motion for Substitution of Party [#100] at 1.  He lived in Florida. [#82] ¶ 28.

6.  On June 8, 2012, Bennett L. Wetzell was appointed the personal representative of Armando's estate. Plaintiffs' Motion for Substitution of Party [#100] at 1.

---

[3] An evidentiary hearing on liability and damages was held from February 22-25, 2011.  The hearing transcripts are all docketed in Buonocore, Civil Action No. 06-727.  In citations to the transcripts, the following convention is used: witness' name, T-date in February 2011 of testimony-transcript page(s).  The first day of the evidentiary hearings in this case was February 22, 2011.  The transcripts from that day are divided into a morning session, designated "22A," and an afternoon session, designated "22B."  The transcript for February 22, 2011 is docketed at [#92] for the morning session and [#101] for the afternoon session; February 23, 2011 at [#102]; February 24, 2011 at [#103]; and February 25, 2011 at [#97].

7.      On the morning of December 27, 1985, Elena was at the Rome Fiumicino airport

preparing to travel back to the U.S. to spend the New Year's holiday with her children

and grandchildren, when terrorists killed her. (B. Pepenella, T-24-130)

8.      After the attack, Elena was transported to the hospital, where she died in the early hours

of December 28, 1985. (Ex. 91; B. Pepenella, T-24-132-33)

9.      Bruno testified that, when he spoke to the doctor at the hospital in Rome where his

mother had been taken after the shooting, he was told that "the machine gun pulverized

[her] from the waist down" and that there was no use in him trying to fly over from the

United States to see her, because she was "not going to make it through the night." (B.

Pepenella, T-24-130-31)

10.     Bruno testified that prior to his marriage, his mother lived with him and that even after he

was married, his relationship with his mother remained very close. (B. Pepenella, T-24-

128)

11.     Bruno testified that after he was married, he saw his mother once or twice every week.

(B. Pepenella, T-24-128)

12.     Bruno testified that every time his mother would travel, Bruno would have her stay at his

house the night before, and cook dinner for her. (B. Pepenella, T-24-129-30)

13.     Bruno testified about how he felt after his mother died:  "For two years, you know, I

couldn't get out of my mind after that happened.  I had a pain in my stomach, and I don't

know where it was, whatever it is called, in other words, the anxiety.  And they said it

was the tension from my mother that I was so tied up that's why it was hurt.  There was

nothing hurt as sickness, in other words.  It was from the muscles pain that I had, and my

muscles tied up, and that's what caused me the pain.  And for two years, I tell you, it was

3

pain because you remember the things.  Every time I go to wash my face in the mirror,

my mother appears there.  It was very, very stressful for the first two years.  It still comes

up every once in awhile [sic]; but, you know, things get away, especially when you don't

mention.  When you start talking about it, it brings back bad memories . . . The worst part

is, you know, she died, and I couldn't say good-bye, I couldn't say how much I love her."

(B. Pepenella, T-24-135-36)

14.   Armando testified about how he felt when he found out his mother had been shot:  "I was

shocked and in panic.  All I wanted to do was get to her to be with her.  I began to realize

that I would probably not be able to make it to Italy before she died.  I felt totally helpless

. . . My mother died the next day, December 28, 1985, in the early morning hours . . . I

was devastated and in disbelief.  She lived for many hours and was conscious for part of

them with these horrific wounds . . . One of the hardest things to live with has always

been that I was not able to see my mother one last time to say good-bye to her . . . There

are no words that can adequately describe the pain or express the loss.  Preparing this

document has brought back many painful emotions." (A. Pepenella, T-24-139-40)

## CONCLUSIONS OF LAW

I.   <u>The Pepenella Brothers</u>

    A.   <u>Application of Italian Law by This Court</u>

Rule 44.1 of the Federal Rules of Civil Procedure provides in pertinent part as follows:

"In determining foreign law, the court may consider any relevant material or source, including

testimony, whether or not submitted by a party or admissible under the Federal Rules of

Evidence.  The court's determination must be treated as a ruling on a question of law." Fed. R.

Civ. P. 44.1.  In this case, the Court's conclusions of law are based upon 1) various articles of the

Italian Civil Code,[4] and 2) an interpretation of that law provided by Avv. Fabio Santaniello,[5] an attorney practicing in Rome.

      B.     <u>Analysis of the Pepenalla Brothers' Claims Under Italian Law</u>

As noted above, the Pepenella brothers assert claims of 1) common law intentional infliction of emotional distress, and 2) common law civil conspiracy. <u>Pepenella Plaintiffs['] Supplemental Findings of Fact and Conclusions of Law</u> [#113] at 3-4.

      1.     <u>Intentional Infliction of Emotional Distress</u>

Under Italian civil law, the Pepenella brothers are entitled to recover damages for intentional infliction of emotional distress because their mother was killed as a result of a crime punishable under two sections of the Italian criminal code.[6] [#120] at 7-8.  In other words, Italian law[7] recognizes the suffering endured by the Pepenella brothers as a tort and allows for the recovery of both pecuniary and non-pecuniary damages.[8] <u>Id.</u> at 4-5.  Pecuniary or economic damages are calculated according to Article 1223 of the Italian civil code, and include both actual damages and lost profits. <u>Id.</u> at 4, 18.  Non-pecuniary damages[9] include 1) moral damages ("the mental anxiety and emotional distress that are the consequence of the wrongful act, not only in their immediate occurrence but also in future perspective"), 2) biological damages ("the

---

[4] In their supplemental brief, plaintiffs provided the Court with copies of the relevant code sections as well as translations thereof.

[5] Plaintiffs provided Avv. Santaniello's analysis in the form of a sworn declaration.

[6] Under Article 575 of the Italian criminal code, "[w]hoever intentionally causes the death of another person is punished with no less than twentyone years in jail" and under Article 422 of the same, "[w]hoever with the intent to kill, commits acts that put public safety in danger, is punished, if from the act derives the death of more than one person, with life imprisonment." [#120] at 27, 34.

[7] Under Article 185 of the Italian criminal code, "[a]ny crime that caused a pecuniary or non-pecuniary damage obligates the guilty party, and those who under civil laws are responsible for him, to compensate the harm caused." [#120] at 24.

[8] Under Article 2043 of the Italian civil code, "[a]ny willful or negligent act, that causes unfair harm to another person, obligates the person who committed it to damages." [#120] at 15.

[9] Under Article 2059 of the Italian civil code, non-pecuniary damages are "compensated only in the cases set forth by the law." [#120] at 21.

harm caused to the psychophysical integrity of the victim or his relatives that results in a medical

condition"), and 3) existential damages ("the damage to the relations and the habits of the

victim."). Id. at 5-6

          a.      Biological Damages

In this case, only Bruno provided evidence of biological damages.  Specifically, he

testified that he suffered severe stomach pains as a result of his mother's death.  Therefore, only

Bruno will be awarded biological damages.

          b.      Moral and Existential Damages

According to plaintiffs, under Italian law, moral and existential damages are those

psychological damages suffered by the victims of tortious acts.  The testimony of the brothers

establishes that they suffered severe psychological damages that are fully compensable under

Italian law, as explained in the Italian statute and the declaration of Avv. Santaniello.

          2.      Civil Conspiracy

Under Italian law, the Pepenella brothers may also recover tort damages, where the injury

or death was the result of a civil conspiracy. [#120] at 9.  It is unclear, however, whether Italian

law allows for the recovery of damages under both tort theories simultaneously.  In the absence

of any indication that Italian law permits such a recovery, the Court will not permit it.

          C.      Calculation of Damages for the Pepenella Brothers

Neither brother will be awarded pecuniary damages.  Both, however, will be awarded

non-pecuniary damages.  Bruno Pepenella will be awarded biological damages for the stomach

pains he suffered and both brothers will be awarded moral and existential damages, for the

psychological pain they both suffered.  Finally, as there is no indication in plaintiffs'

supplemental submission that Italian law permits the recovery of prejudgment interest, none shall be allowed.

Damages to the Pepenella brothers shall be awarded as follows:

| Plaintiff | A. Pecuniary Damages | Non-Pecuniary Damages | | Total Award (A + B + C) |
|---|---|---|---|---|
| | | B. Biological Damages | C. Moral and Existential Damages | |
| Bruno Pepenella | $0 | $1 M | $5 M | $6,000,000 |
| Armando Pepenella (estate of) | $0 | $0 | $5 M | $5,000,000 |

II.     The Other Plaintiffs

In Baker v. Socialist People's Libyan Arab Jamahirya, 775 F. Supp. 2d 48 (D.D.C. 2011), and in other Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, cases that followed (including the instant case), this Court based its award of prejudgment interest on the testimony of Dr. Markham, plaintiff's expert witness in the area of forensic economics, and the D.C. Circuit's decision in Forman v. Korean Air Lines Col, Ltd., 84 F.3d 446 (D.C. Cir. 1996). Baker, 775 F. Supp. 2d at 86. Specifically, this Court calculated prejudgment interest by averaging the annual prime rates for each year between the date of the incident and the date of the award. Id. However, in Estate of Doe v. Islamic Republic of Iran, ___ F. Supp. 2d ___, No. 08-CIV-540, 2013 WL 1908987 (D.D.C. May 9, 2013), Judge Bates concluded that, under Forman, the "more precise" method of calculating the prime rate is to use the rate for each year, rather than averaging the rates. Id. at *2-3. This Court will, therefore, revise its previous calculation of prejudgment interest as to the other plaintiffs.

Thus, in this case, using the prime rate for *each* year between the date of the incident and the present, the Court will apply a multiplier of 6.2045, as demonstrated in Court's Exhibit 1.[10]

Damages to the other plaintiffs shall be revised as follows:

| Plaintiff | Compensatory Damages | | | | E. Punitive Damages | Total Award (A + D + E) |
|---|---|---|---|---|---|---|
| | A. Economic | B. Pain & Suffering | C. Solatium | D. Prejudgment Interest Calculation (B + C x 6.2045) | | |
| Don Maland (estate of) | $2,344,959 | $1 M | | $6,204,500 | $150 M | $158,549,459 |
| Einar Maland (estate of) | | | $5 M | $31,022,500 | $150 M | $181,022,500 |
| Jane Maland | | | $2.5 M | $15,511,250 | $150 M | $165,511,250 |
| Mark Maland | | | $2.5 M | $15,511,250 | $150 M | $165,511,250 |
| Ellen Maland | | | $2.5 M | $15,511,250 | $150 M | $165,511,250 |
| Tim Maland | | | $2.5 M | $15,511,250 | $150 M | $165,511,250 |
| Grace Maland (estate of) | | | $5 M | $31,022,500 | $150 M | $181,022,500 |
| John Buonocore, III (estate of) | $2,388,125 | | | | $150 M | $152,388,125 |
| John Buonocore, Jr. | | | $5 M | $31,022,500 | $150 M | $181,022,500 |
| Cecile Buonocore | | | $5 M | $31,022,500 | $150 M | $181,022,500 |
| Todd Buonocore | | | $2.5 M | $15,511,250 | $150 M | $165,511,250 |
| Frederick Gage (estate of) | $3,420,069 | | | | $150 M | $153,420,069 |
| Nancy Gage | | | $2.5 M | $15,511,250 | $150 M | $165,511,250 |
| Charles Shinn | | $1 M | $4 M | $31,022,500 | $150 M | $181,022,500 |

[10] The multipliers are calculated based on the average annual prime rate for each year, assuming annual compounding.  See Estate of Doe v. Islamic, 2013 WL 1908987, at *2-3 (discussing various approaches to the calculation of prejudgment interest).  The average annual prime rate is that figure listed by the Federal Reserve.  See Bd. of Governors of the Fed. Reserve Sys. Historical Data, http://www.federalreserve.gov/releases/h15/data.htm (last visited June 21, 2013).

| | | | | | |
|---|---|---|---|---|---|
| (estate of) | | | | | |
| Jeanne Shinn (estate of) | | $1 M | $4 M | $31,022,500 | $150 M | $181,022,500 |
| Michael Sweis (estate of) | | $1 M | $2.5 M | $21,715,750 | $150 M | $171,715,750 |
| Aida Sweis (estate of) | | | $4 M | $24,818,000 | $150 M | $174,818,000 |
| Jeanette Sweis | | $1 M | $1.25 M | $13,960,125 | $150 M | $163,960,125 |
| Juliet Sweis | | $1 M | $1.25 M | $13,960,125 | $150 M | $163,960,125 |
| Sayel Sweis | | | $1.25 M | $7,755,625 | $150 M | $157,755,625 |
| Saied Sweis | | $250 K | $1.25 M | $9,306,750 | $150 M | $159,306,750 |
| Natasha Simpson (estate of) | $1,291,125 | | | | $150 M | $151,291,125 |
| Antonia Daniela Simpson | | | $5 M | $31,022,500 | $150 M | $181,022,500 |
| Victor Simpson | | $1 M | $5 M | $37,227,000 | $150 M | $187,227,000 |
| Michael Simpson | | $1 M | $2.5 M | $21,715,750 | $150 M | $171,715,750 |
| Elena Tommarello (estate of) | | $1 M | | $6,204,500 | $150 M | $156,204,500 |

A separate judgment will follow the issuance of these findings of fact and conclusions of law.



Digitally signed by John M. Facciola
DN: c=US, st=DC, l=Washington,
email=john_m._facciola@dcd.uscou
rts.gov, o=United States District
Court for the District of Columbia,
cn=John M. Facciola
Date: 2013.07.23 12:01:29 -04'00'

JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE

## Calculation of Multiplier for Injury that Occurred in December 1985
### (Assume $1 for the first year)

| Year | Average Prime Rate | Total |
|------|-------------------|-------|
| 1985 | | $1.0000 |
| 1986 | 8.33 | $1.0833 |
| 1987 | 8.21 | $1.1722 |
| 1988 | 9.32 | $1.2815 |
| 1989 | 10.87 | $1.4208 |
| 1990 | 10.01 | $1.5630 |
| 1991 | 8.46 | $1.6952 |
| 1992 | 6.25 | $1.8012 |
| 1993 | 6 | $1.9093 |
| 1994 | 7.15 | $2.0458 |
| 1995 | 8.83 | $2.2264 |
| 1996 | 8.27 | $2.4105 |
| 1997 | 8.44 | $2.6140 |
| 1998 | 8.35 | $2.8323 |
| 1999 | 8 | $3.0588 |
| 2000 | 9.23 | $3.3412 |
| 2001 | 6.91 | $3.5721 |
| 2002 | 4.67 | $3.7389 |
| 2003 | 4.12 | $3.8929 |
| 2004 | 4.34 | $4.0619 |
| 2005 | 6.19 | $4.3133 |
| 2006 | 7.96 | $4.6566 |
| 2007 | 8.05 | $5.0315 |
| 2008 | 5.09 | $5.2876 |
| 2009 | 3.25 | $5.4594 |
| 2010 | 3.25 | $5.6369 |
| 2011 | 3.25 | $5.8201 |
| 2012 | 3.25 | $6.0092 |
| 2013 | 3.25 | $6.2045 |